# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

**KERRY HODGE, JESSICA CANNON, JOLANDA KING, and DON MCGEE,** *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

**AHS MANAGEMENT COMPANY, INC.,**

Defendant.

**Case No. 3:23-cv-01308**

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kerry Hodge, Jessica Cannon, Jolanda King, and Don McGee, individually and on behalf of all similarly situated persons, allege the following against AHS Management Company, Inc. d/b/a Ardent Health Services (collectively, "AHS" or "Defendant")[1] based on personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents, as to all other matters:

### I.    NATURE OF THE ACTION

1.    This class action arises out of the cyberattack and data breach of which AHS became aware of on November 23, 2023 ("Data Breach") resulting from AHS's failure to implement reasonable and industry standard data security practices.

2.    AHS is one of a leading provider of healthcare services in the United States.[2] "Through its subsidiaries, AHS owns and operates 30 hospitals and 200+ sites of care with more than 1,400

---

[1] Plaintiffs originally named "AHS Medical Holdings LLC d/b/a Ardent Health Services and Ardent Medical Services, Inc. d/b/a Ardent Health Services" as Defendant. Counsel for Defendant informed Plaintiffs that the correct entity for this matter is "AHS Management Company, Inc."
[2] *Who We Are*, Ardent Health, https://ardenthealth.com/who-we-are (last visited Mar. 5, 2024).

aligned providers in six states,"[3] and, in the course of providing those services, AHS collected and maintained certain personally identifiable information of Plaintiffs and the putative Class Members (defined below).

3. Plaintiffs' and Class Members' sensitive personal information—which they entrusted to Defendant via the hospitals and healthcare clinics it owns ("Providers"), on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

4. The Private Information compromised in the Data Breach was exfiltrated by cybercriminals and remains in the hands of those cybercriminals who targeted the Private Information for its value to identity thieves.

5. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to: (i) Plaintiffs' Private Information being disseminated on the Dark Web; (ii) Plaintiffs experiencing an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of Plaintiffs' Private Information; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

---

[3] *Id.*

6. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect its patients' Private Information from a foreseeable and preventable cyberattack.

7. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

8. Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

9. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained is now in the hands of data thieves.

10. Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing

3

fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

11.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

12.     Plaintiffs and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

13.     Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

14.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.     Plaintiffs seek remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## II.     PARTIES

16.     Plaintiff **Kerry Hodge** is, and at all times mentioned herein was, an individual citizen and resident of the State of Texas.

4

17.     Plaintiff **Jessica Cannon** is, and at all times mentioned herein was, an individual citizen and resident of the State of Texas.

18.     Plaintiff **Jolanda King** is, and at all times mentioned herein was, an individual citizen and resident of the State of New Mexico.

19.     Plaintiff **Don McGee** is, and at all times mentioned herein was, an individual citizen and resident of the State of Oklahoma.

20.     Defendant **AHS Management Company, Inc., d/b/a Ardent Health Services** is a Delaware corporation with its principal place of business located at 1 Burton Hills Blvd., Suite 250, Nashville, Tennessee 37215.

21.     AHS, through its parent, subsidiaries, and/or affiliates, owns and operates a network of health systems doing business under the name Ardent Health Services or Ardent. In 2015, AHS was purchased by investment companies Ventas Inc. and Equity Group Investments.

### III.     URISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is over 100, many of whom reside outside the state of Tennessee and have different citizenship from AHS, including Plaintiffs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23.     This Court has jurisdiction over AHS because AHS operates in this District, and its headquarters is located in this District.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and AHS has harmed Class Members residing in this District.

5

## IV.    FACTUAL ALLEGATIONS

### A.    Defendant's Business and The Data Breach

25.    AHS is a leading provider of healthcare services and operates 30 hospitals and more than 200 other healthcare offices in six states.[4]

26.    In the course of their patient-provider relationship, patients, including Plaintiffs and Class Members, provided Defendant, indirectly or directly, with sensitive Private Information.

27.    On November 27, 2023, AHS posted a Notice of Cybersecurity Incident on its website ("Notice").[5] Omitted from the Notice were the root cause of the Data Breach, the vulnerabilities exploited, the remedial measures undertaken to ensure such a breach does not occur again, and the types of data disclosed. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

28.    Upon information and belief, the cyberattack was targeted at Defendant, due to its status as a healthcare service provider that collects, creates, and maintains Private Information on its computer networks and/or systems.

29.    The files containing Plaintiffs' and Class Members' Private Information, that were targeted and stolen from Defendant, included their "patient contact information (e.g., address, phone number, email address), Social Security numbers, medical treatment information (e.g., providers, dates of service, diagnoses, prescriptions), health insurance and claims information, and Medicaid / Medicare numbers."[6]

---

[4] *Who We Are*, *supra* note 2; *Locations*, Ardent Health, https://ardenthealth.com/locations (last visited Mar. 5, 2024).
[5] *Cybersecurity Incident*, Ardent Health, https://ardenthealth.com/cybersecurityincident (last visited Mar. 5, 2024).
[6] *Id.*

6

30.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendant that included the Private Information of Plaintiffs and Class Members.

31.     As evidenced by the Data Breach, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

32.     Plaintiffs' Private Information was accessed and stolen in the Data Breach and Plaintiffs have come to learn that their stolen Private Information is currently available for sale on the Dark Web following the Data Breach.

33.     Plaintiffs have also experienced an increased number of spam and suspicious messages following the Data Breach and believe that these may be phishing attempts designed to gain access to additional personal information.

34.     Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

35.     Defendant had obligations created by the FTC Act, HIPAA, contract, state and federal law, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

**B.     *Data Breaches Are Preventable.***

36.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

37.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members,

causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

38.    The unencrypted Private Information of Class Members will end up for sale to identity thieves on the Dark Web, if it has not already, or it could simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

39.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts

- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[7]

40. Given that Defendant was storing the Private Information of healthcare patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

41. The Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of over three hundred thousand patients, including that of Plaintiffs and Class Members.

C.   ***Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' Private Information.***

42. Defendant acquires, collects, and stores a massive amount of Private Information in the regular course of its business.

43. As a condition of obtaining medical services at an AHS hospital or provider, Defendant requires that patients, former patients, and other personnel entrust it with highly sensitive personal information.

44. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that

---

[7] *See Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Feb. 22, 2024).

it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

45.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

46.     Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**D.     *Defendant Knew or Should Have Known of the Risk Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable to Cyberattacks.***

47.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendant, preceding the date of the Breach.

48.     Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

49.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[8]

50.     The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[9]

---

[8] *See* 2021 Data Breach Annual Report at 6 (ITRC, Jan. 2022), https://notified.idtheftcenter.org/s/.
[9] *Id.*

51.     Indeed, cyberattacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

52.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

53.     Defendant knew and understood that unprotected or exposed Private Information in the custody of healthcare services entities, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

54.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the

_____

[10] Ben Kochman, *FBI, Secret Service Warn Of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited Mar. 5, 2024).

foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

55.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

56.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

57.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

### E.     *Value of Personally Identifiable Information*

58.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

---

[11] 17 C.F.R. § 248.201 (2013).
[12] *Id.*

59.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web.

60.     Numerous sources cite Dark Web pricing for stolen identity credentials.[13] For example, Private Information can be sold at a price ranging from $40 to $200.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

61.     PII can sell for as much as $363 per record according to the Infosec Institute.[16] PII is particularly valuable because criminals can use it to target victims with frauds and scams.

62.     Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

63.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[13] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Mar. 5, 2024).

[14] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Mar. 5, 2024).

[15] *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Mar. 5, 2024).

[16] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Feb. 22, 2024).

13

64. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

65. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[17]

66. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

67. Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[18]

68. According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

---

[17] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, NAKED SECURITY (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited Feb. 22, 2024).
[18] Lee Matthews, *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, FORBES (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited Feb. 22, 2024).

69. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[19] However, this is not the case. As cybersecurity experts point out[20]:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.

70. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[21]

71. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches[22]:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[19] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAG. (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited Mar. 5, 2024).
[20] *Id.*
[21] Ron Lieber, *How Identity Thieves Took My Wife for a Ride*, NY TIMES (Apr. 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited Mar. 5, 2024).
[22] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Report to Congressional Requesters* at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Mar. 5, 2024) ("GAO Report").

72. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[23] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[24] Each of these fraudulent activities is difficult to detect. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

73. Moreover, it is not an easy task to change or cancel a stolen Social Security number:[25]

An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

74. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card

---

[23] *Identity Theft and Your Social Security number*, Soc. Sec. Admin. (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 22, 2024).
[24] *Id.*
[25] Brian Naylor, *Victims of Social Security number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Feb. 22, 2024).

information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[26]

75.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and PHI.

**F.    Defendant Fails to Comply with FTC Guidelines.**

76.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

77.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[27]

---

[26] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, COMPUTER WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 22, 2024).

[27] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Feb. 22, 2024).

78. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[28]

79. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80. The FTC has brought enforcement actions against healthcare entities for failing to protect patient data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81. These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g.*, *In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (AHS) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

82. Defendant failed to properly implement basic data security practices.

---

[28] *Id.*

83. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

84. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### G. Defendant Fails to Comply with HIPAA Guidelines.

85. Defendant is a covered Business Associate under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

86. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[29] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

87. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

88. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

---

[29] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

89. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

90. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

91. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

92. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

93.     HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. § 17902.

94.     The HIPAA Breach Notification Rule, 45 C.F.R. § 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[30]

95.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

96.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

97.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the

---

[30]     *Breach Notification Rule*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Feb. 22, 2024).

confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[31] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[32]

### H. Defendant Fails to Comply with Industry Standards.

98. As noted above, experts studying cybersecurity routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

99. Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

100. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network

---

[31] *Security Rule Guidance Material*, U.S. DEP'T OF HEALTH & HUMAN SERVS., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Feb. 22, 2024).
[32] *Guidance on Risk Analysis*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Feb. 22, 2024).

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

101.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and upon information and belief, Defendant failed to comply with at least one––or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### I.    Common Injuries & Damages

103.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of

Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

### J. *The Data Breach Increases Victims' Risk of Identity Theft.*

104. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come.

105. The unencrypted Private Information of Class Members will end up for sale on the Dark Web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

106. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

107. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

108. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

109. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[33]

110. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

111. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still

---

[33] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the Dark Web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Feb. 22, 2024).

easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

112. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the Data Breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

113. Thus, even if certain information (such as telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

114. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### K. Loss of Time to Mitigate Risk of Identity Theft and Fraud

115. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

116. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendant's Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.

117. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as contacting their banks to ensure their financial accounts are secured.

26

118.     Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[34]

119.     Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

120.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[36]

---

[34] *See* GAO Report, *supra* note 22.
[35] *See* *IdentityTheft.gov*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited Feb. 22, 2024).
[36] Jason Steele, *Credit Card and ID Theft Statistics* (Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Feb. 22, 2024).



**Americans' expenses/disruptions as a result of criminal activity in their name (2016)**

| | |
|---|---|
| I had to request government assistance | 29.5% |
| I had to borrow money | 60.7% |
| Had to use my savings to pay for expenses | 32.8% |
| Couldn't qualify for a home loan | 32.8% |
| I lost my home/place of residence | 31.1% |
| I couldn't care for my family | 34.4% |
| Had to rely on family/friends for assistance | 49.2% |
| Lost out on an employment opportunity | 44.3% |
| Lost time away from school | 19.7% |
| Missed time away from work | 55.7% |
| Was generally inconvenienced | 73.8% |
| Other | 23% |
| None of these | 3.3% |

Source: Identity Theft Resource Center

creditcards.com

121.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[37]

**L.**    ***Diminution Value of Private Information***

122.    PII and PHI are valuable property rights.[38] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[37] *See* "GAO Report, *supra* note 22.

[38] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

123. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[39]

124. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[40]

125. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[41]

126. Conversely sensitive PII can sell for as much as $363 per record on the Dark Web according to the Infosec Institute.[42]

127. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

128. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[39] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Mar. 5, 2024).
[40] https://datacoup.com/ (last visited Feb. 22, 2024).
[41] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Feb. 22, 2024).
[42] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, *supra* note 16.

compromised in this Data Breach is static and impossible to "close" and difficult, if not impossible, to change, *e.g.*, names, Social Security numbers, dates of birth, and PHI.

129. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

130. The fraudulent activity resulting from the Data Breach may not come to light for years.

131. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

132. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network and the significant number of individuals who would be harmed by the exposure of the unencrypted data.

133. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**M.** **Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.**

134. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, the volume of data obtained in the Data Breach, and Plaintiffs' Private Information already being disseminated on the Dark Web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/ Dark Web for sale and purchase by criminals intending to utilize the Private

Information for identity theft crimes—*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

135.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

136.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[43] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

137.    Consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

138.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

_____

[43] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

### N.  *Plaintiffs' Experiences*

**Plaintiff Kerry Hodge**

139.    Plaintiff Hodge is a patient of Defendant at Baptist St. Anthony Hospital. As a condition to receiving medical services, Plaintiff was required to and Plaintiff provided his PII and PHI to Defendant, which was then entered into Defendant's systems, on the Defendant's online portal and maintained on its network.

140.    Plaintiff Hodge greatly values his privacy and PII, especially when submitting information related to health care providers. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of his Private Information—e.g., Plaintiff Hodge stores sensitive documents with his Private Information in safe and secure locations and safely destroys sensitive documents; moreover, he diligently selects unique usernames and passwords on his various accounts; and he has not knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

141.    Plaintiff Hodge first saw a pop-up on Defendant's online portal, then received a letter dated January 22, 2024 from Defendant concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff's Private Information. The letter states that the Plaintiff's compromised files contained his date of birth, medical history, health insurance policy and/or claims and Medicaid or Medicare number that Defendant obtained in connection with its business operations.

142.    Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff faces, Defendant offered twelve (12) months of identity theft protection services through Cyberscout.

143.    Since the Data Breach, Plaintiff Hodge has checked his credit and been notified that his information has been found on the Dark Web.

144.    As a result, Plaintiff Hodge has contacted all three credit bureaus and placed a credit freeze and fraud alerts on his accounts. Those safeguards remain in place.

145.    Additionally, Plaintiff Hodge has been forced to change passwords on his accounts, including his financial accounts as well as his Social Security account, his Baptist St. Anthony Hospital portal account, and other medical providers accounts as a result of the Breach.

146.    The letter Hodge Plaintiff received also advised him to "remain vigilant to prevent identity theft and fraud" by reviewing your account information and credit reports for "suspicious activity," which he has done.

147.    Since learning of the Data Breach, Plaintiff Hodge has heeded Defendant's advice and warnings and spent additional time in response to the Data Breach. Specific examples of time spent include that since the Data Breach, he has spent approximately 15–20 hours reviewing and monitoring his accounts, making changes and speaking to people on the phone.

148.    Plaintiff Hodge plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for unauthorized activity.

149.    Plaintiff Hodge has also noticed an increase in spam calls, text messages, and phishing emails to the email account he provided to Defendant, all after the Data Breach.

150.    The Data Breach has caused Plaintiff Hodge to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright about the cause and full scope of the PII compromised in the Data Breach.

33

151.    Plaintiff Hodge has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Jessica Cannon**

152.    Plaintiff Cannon is a previous patient of Defendant at BSA Hospital. As a condition to receiving medical services, Plaintiff was required to and Plaintiff provided her PII and PHI to Defendant, which was then entered into Defendant's systems, on the Defendant's online portal and maintained on its network.

153.    Plaintiff Cannon greatly values her privacy and PII, especially when submitting information related to health care providers. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of his Private Information—e.g., Plaintiff Cannon stores sensitive documents with her Private Information in safe and secure locations and safely destroys sensitive documents; moreover, she diligently selects unique usernames and passwords on her various accounts; and she has not knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

154.    Plaintiff Cannon then received a letter dated January 22, 2024 from Defendant concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff Cannon's Private Information. The letter states that the Plaintiff's compromised files contained her date of birth, medical history, medical record number, and health insurance policy and/or claims that Defendant obtained in connection with its business operations.

155.     Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff Cannon faces, Defendant offered twelve (12) months of identity theft protection services through Cyberscout.

156.     Since the Data Breach, Plaintiff has checked her credit via IdentityIQ and been notified that her information has been found on the Dark Web, as recently as December 30, 2023.

157.     The letter Plaintiff Cannon received also advised her to "remain vigilant to prevent identity theft and fraud" by reviewing your account information and credit reports for "suspicious activity," which she has done.

158.     Plaintiff Cannon has also noticed an increase in spam calls after the Data Breach.

159.     The Data Breach has caused Plaintiff Cannon to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright about the cause and full scope of the PII compromised in the Data Breach.

160.     Plaintiff Cannon has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Jolanda King**

161.     Plaintiff King was a patient of Defendant. As a condition to receiving medical services, Plaintiff was required to and Plaintiff provided her PII and PHI to Defendant, which was then entered into Defendant's systems and maintained on its network.

162.     Plaintiff King greatly values her privacy and PII, especially when submitting information related to health care providers. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of her PII—e.g., Plaintiff King stores sensitive documents with PII in safe and secure locations and safely destroys sensitive documents; moreover, she

diligently selects unique usernames and passwords on her various accounts; and she has not knowingly transmitted unencrypted PII over the internet or other unsecured source.

163.    Plaintiff received a letter dated January 22, 2024 from Defendant concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff's PII. The compromised files contained the dates of birth, Social Security numbers, and medical information that Defendant obtained in connection with its business operations.

164.    Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff faces, Defendant offered her twelve (12) months of identity theft protection services through Cyberscout.

165.    Since AHS's Data Breach, Plaintiff has been notified that her information has been found on the Dark Web.

166.    Additionally, Plaintiff has been forced to change her password information and get new credit cards as a result of the breach.

167.    The letter Plaintiff received also advised her to "remain vigilant to prevent identity theft and fraud" by reviewing your account information and credit reports for "suspicious activity."

168.    Since learning of the Data Breach, Plaintiff King has heeded Defendant's advice and warnings and spent additional time in response to the Data Breach. Specific examples of time spent include that since the Data Breach, she monitors her accounts each week for about a half an hour at a time.

169.    Plaintiff King plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit and other accounts for unauthorized activity.

170. Plaintiff King has also noticed an increase in other spam calls, text messages, and phishing emails after the Data Breach. She receives at least 5-10 spam calls per week.

171. The Data Breach has caused Plaintiff King to suffer fear, anxiety, and stress, which has been compounded by the fact that AHS has not been forthright about the cause and full scope of the PII compromised in the Data Breach.

172. Plaintiff King has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Don McGee**

173. Plaintiff McGee is a former patient of Defendant. As a condition to receiving medical service, Plaintiff was required to and Plaintiff provided his PII and PHI to Defendant, which was then entered into Defendant's systems and maintained on its network.

174. Plaintiff McGee greatly values his privacy and PII, especially when submitting information related to health care providers. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of his PII—e.g., Plaintiff McGee stores sensitive documents with PII in safe and secure locations and safely destroys sensitive documents; moreover, he diligently selects unique usernames and passwords on his various accounts; and he has not knowingly transmitted unencrypted PII over the internet or other unsecured source.

175. Plaintiff McGee received a letter dated January 30, 2024 from Defendant concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff's PII. The compromised files contained the dates of birth, social security numbers, and medical information that Defendant obtained in connection with its business operations.

176.     Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff McGee faces, Defendant offered him twelve (12) months of identity theft protection services through Cyberscout.

177.     Since AHS's Data Breach, Plaintiff became the victim of identity theft. His Direct Express Comerica Bank account has an unauthorized charge for $14.00.

178.     The letter Plaintiff received also advised him to "remain vigilant to prevent identity theft and fraud" by reviewing your account information and credit reports for "suspicious activity."

179.     Since learning of the Data Breach, Plaintiff McGee has heeded Defendant's advice and warnings and spent additional time in response to the Data Breach. Specific examples of time spent include that since the Data Breach, he monitors his accounts each week for about 40 minutes at a time.

180.     Plaintiff McGee plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit and other accounts for unauthorized activity.

181.     Plaintiff McGee has also noticed an increase in other spam calls, text messages, and phishing emails after the Data Breach. He receives at least 5–10 spam calls per week.

182.     The Data Breach has caused Plaintiff McGee to suffer fear, anxiety, and stress, which has been compounded by the fact that AHS has not been forthright about the cause and full scope of the PII compromised in the Data Breach.

183.     Plaintiff has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## V.     <u>CLASS ACTION ALLEGATIONS</u>

184.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

185.     Specifically, Plaintiffs propose the following class definitions, subject to amendment as appropriate:

> All individuals who reside in the United States whose Private Information was exposed in the Data Breach involving Defendant (the "Class").

186.     Excluded from the Classes are Defendant and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

187.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes, as well as add subclasses, before the Court determines whether certification is appropriate.

188.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

189.     <u>Numerosity</u>: The Members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

190.     <u>Commonality</u>. There are questions of law and fact common to the Classes which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.     Whether Defendant engaged in the conduct alleged herein;
>
> b.     When Defendant learned of the Data Breach;

c.      Whether Defendant's response to the Data Breach was adequate;

d.      Whether Defendant unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

e.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f.      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

g.      Whether Defendant breached its duties to Class Members to safeguard their Private Information;

h.      Whether hackers obtained Class Members' Private Information via the Data Breach;

i.      Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

j.      Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

k.      Whether Defendant knew or should have known that Defendant's data security systems and monitoring processes as such relate to its secure file transfer services were deficient;

l.      What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

m.      Whether Defendant's conduct was negligent;

n.      Whether Defendant was unjustly enriched;

o.      Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

p.      Whether Plaintiffs and Class Members are entitled to credit or identity monitoring and monetary relief; and

q.      Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

191.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

192.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

193.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

194.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

195. Class certification is also appropriate. Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate to the Class as a whole.

196. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI.    CLAIMS FOR RELIEF

### COUNT I
**Negligence**
*(On Behalf of Plaintiffs and the Class)*

197. Plaintiffs restate and reallege in paragraphs 1 through 196 above as if fully alleged herein.

198. Defendant collects the Private Information of its patients, including that of Plaintiffs and Class Members, in the ordinary course of providing its healthcare services.

199. Plaintiffs and Class Members entrusted Defendant with their Private Information, directly or indirectly, with the understanding that Defendant would safeguard their information.

200.     Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

201.     By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

202.     Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

203.     Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

204.     Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure

that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

205.     Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of being patients at Defendant.

206.     Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

207.     Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

208.     Defendant also had a duty to exercise appropriate clearinghouse practices to remove former patients' Private Information it was no longer required to retain pursuant to regulations.

209.     Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

210.     Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

211.     Defendant breached its duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect

Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.       Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.       Failing to adequately monitor the security of their networks and systems;

c.       Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.       Allowing unauthorized access to Class Members' Private Information;

e.       Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f.       Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations,

g.       Failing to timely and adequately notify Class Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h.       Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

212.    Defendant violated Section 5 of the FTC Act and HPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

213. Plaintiffs and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

214. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

215. Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

216. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

217. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

218. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

219. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

220. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance

of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

221.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

222.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and remains in, Defendant's possession.

223.    Defendant was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

224.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* RESTATEMENT (SECOND) OF TORTS § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

225.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

226.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

227.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise

reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

228.     As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) Plaintiffs' Private Information being disseminated on the Dark Web; (ii) Plaintiffs experiencing an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of their Private Information; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

229.     As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

230.     Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

231.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

232.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

233.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Implied Contract
### *(On Behalf of Plaintiffs and the Class)*

234.    Plaintiffs restate and reallege paragraphs 1 through 196 above if fully set forth herein.

235.    Plaintiffs and Class Members were required to provide their Private Information to Defendant as a condition of receiving healthcare services from Defendant.

236.    Plaintiffs and the Class entrusted their Private Information to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

237.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

238.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private

Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

239.     The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

240.     Defendant solicited, offered, and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

241.     In accepting the Private Information of Plaintiffs and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the Private Information from unauthorized access or disclosure.

242.     On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

243.     On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

244.     Plaintiffs and Class Members paid money and provided their Private Information to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

245.     Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

246.     Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

247.     Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

248.     Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

249.     As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

250.     Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

251.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
### Unjust Enrichment
### *(On Behalf of Plaintiffs and the Class)*

252.    Plaintiffs restate and reallege paragraphs 1 through 196 above as if fully alleged herein.

253.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid for services from Defendant's Providers and in so doing also provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant's Providers the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

254.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

255.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

256.    Defendant acquired Plaintiffs' and Class Members' Private Information through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

257.    If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information at Defendant or obtained services at Defendant's Providers.

258. Plaintiffs and Class Members have no adequate remedy at law.

259. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

260. Plaintiffs and Class Members are entitled to restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

261. Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Breach of Fiduciary Duty**
***(On Behalf of Plaintiffs and the Class)***

262. Plaintiffs restate and reallege paragraphs 1 through 196 above as if fully alleged herein.

263. Plaintiffs bring this claim individually and on behalf of the Class Members.

264. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

265.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its current and former patients and employees to keep secure their Private Information. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiffs and Class in a reasonable and practicable period of time.

266.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

267.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

268.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

269.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms

of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

270.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT V**
**Invasion of Privacy**
*(On Behalf of Plaintiffs and the Class)*

271.    Plaintiffs restate and reallege paragraphs 1 through 196 above as if fully alleged herein.

272.    Plaintiffs bring this claim individually and on behalf of the Class Members.

273.    Plaintiffs and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

274.    As a result of Defendant's conduct, publicity was given to Plaintiffs' and Class Members' Private Information, which necessarily includes matters concerning their private life such as PII and PHI.

275.    A reasonable person of ordinary sensibilities would consider the publication of Plaintiffs' and Class Members' Private Information to be highly offensive.

276.    Plaintiffs' and Class Members' Private Information is not of legitimate public concern and should remain private.

277.    As a direct and proximate result of Defendant's public disclosure of private facts, Plaintiffs and Class Members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs

incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

278.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

279.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

1.    For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

2.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of

Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

3. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

    iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

    v. prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

    vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on

Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.     requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.      requiring Defendant to conduct regular database scanning and securing checks;

xi.     requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

4.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

5.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

6.    For prejudgment interest on all amounts awarded; and

7.    Such other and further relief as this Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all issues so triable.

DATED: March 5, 2024                    Respectfully submitted

/s/ Lisa A. White
Lisa A. White (TN Bar No. 026658)
**MASON LLP** (primary office address)
5335 Wisconsin Ave. NW, Suite 640
Washington, D.C. 20015
Telephone: (202) 429-2290
lwhite@masonllp.com

Ken Grunfeld*
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
grunfeld@kolawyers.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462
klaukaitis@laukaitislaw.com

*Counsel for Plaintiffs and the Proposed Class*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of March 2024, I caused the foregoing

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** to be filed electronically

with the Clerk of Court by using the CM/ECF system which shall serve a copy on all counsel of

record, including:

Kathryn Hannen Walker
Jeff H. Gibson
Taylor M. Sample
Briana T. Sprick Schuster
**Bass, Berry & Sims**
kwalker@bassberry.com
jgibson@bassberry.com
taylor.sample@bassberry.com
briana.sprick.schuster@bassberry.com

*Attorneys for Defendant AHS Management
Company, Inc.*

Kenneth J. Grunfeld
**Kopelowitz Ostrow Ferguson Weiselberg
Gilbert**
grunfeld@kolawyers.com

Kevin Laukaitis
**Laukaitis Law LLC**
klaukaitis@laukaitislaw.com

*Additional Attorney for Plaintiffs*

By: */s/ Lisa A. White*
Lisa A. White (TN Bar No. 026658)
**MASON LLP**

*Attorney for Plaintiffs*